# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| LENDUS, LLC,<br><br>    Plaintiff,<br><br> v.<br><br>JOHN GOEDE and JOHN<br>SCHRENKEL,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)   C.A. No. 2018-0233-SG<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION

Date Submitted: December 4, 2018
Date Decided: December 10, 2018

Stephen L. Caponi and Matthew B. Goeller, of K&L GATES LLP, Wilmington, Delaware, *Attorneys for Plaintiff*.

Richard M. Beck and Sean M. Brennecke, of KLEHR HARRISON HARVEY BRANZBURG LLP, Wilmington, Delaware; OF COUNSEL: Clifford A. Wolff, of WOLFF LAW, Fort Lauderdale, Florida; David K. Stein, of BRICKER & ECKLER, of Columbus, Ohio, *Attorneys for Defendants*.

John G. Harris, of BERGER HARRIS LLP, Wilmington, Delaware, *Attorney for Non-Parties David K. Stein and Bricker & Eckler LLP*.

GLASSCOCK, Vice Chancellor

It is a rare case, fortunately, where this Court must become involved in adjudicating meaningful motions for sanctions based on lawyer misconduct. To quote the wise words of Vice Chancellor Laster, counsel should "think twice, three times, four times, perhaps even more" before seeking sanctions.[1] That is not to say, however, that this Court does not take seriously its responsibility to oversee the conduct of attorneys practicing before it. While most inappropriate conduct by attorneys is the province of disciplinary counsel, in the rare case where the conduct of counsel endangers the administration of justice toward those litigating here, this Court must act. This, I think, is one such case.

It is worth pointing out that Court rules and the Delaware Rules of Professional Conduct constitute the limits of behavior, and are not practice guidelines. The norms of civility and candor expected of Delaware lawyers are not only a part of the heritage of practice cherished by our bar, but are essential to the administration of justice. In other words, Delaware practitioners, whether indigenous or *pro hac vice*, should respect these norms because they are good and right; when they do not, the courts must enforce them because they are indispensable to our ability to perform the core functions of a justice system.

---

[1] *Katzman v. Comprehensive Care Corp.*, C.A. No. 5892-VCL, at 13:9–12 (Del. Ch. Dec. 28, 2010) (Laster, V.C.) (TRANSCRIPT).

Judges are lawyers. We understand the pressures and frustrations of practice. It is no pleasure to criticize the practice of others, none of our own eyes being timber-free. Nonetheless, when gamesmanship and incivility become a drag on justice, we must act.

Below, I discuss cross-motions for sanctions. Only the Plaintiff's motions are substantial. The Defendants are represented by counsel licensed to practice in the state of Ohio. Their attorney, David K. Stein, appears here as a courtesy extended to him to practice *pro hac vice* at the recommendation of, and with the assistance of, Delaware counsel. His behavior has fallen short of that expected of counsel practicing before the Bar of the Supreme Court of the State of Delaware. Two fundamental principles are thus put in tension: the right of litigants, consistent with the rules limiting practice in Delaware, to have the attorney of their choosing; and the principles of justice alluded to above. Here, I find, the latter must control. Some of the alleged misconduct involves collateral litigation in other jurisdictions; that, I address by reference to the disciplinary counsel of the appropriate jurisdiction. With respect to misconduct in this litigation, I find it appropriate to grant Mr. Stein's motion to withdraw his admission *pro hac vice*, and to refer the matter to disciplinary counsel for its review.

## I. BACKGROUND

*A. The Parties and Relevant Non-Parties*

Plaintiff LendUS, LLC is a mortgage lender, servicer, and seller of residential mortgages that is licensed to operate in forty states.[2] It is incorporated in Delaware and has a principal place of business in Alamo, California.[3]

Defendant John Goede is a former LendUS employee.[4] He is also the founder of American Eagle Mortgage Co., LLC.[5] He came to work for LendUS as part of LendUS's merger with American Eagle Mortgage's parent company in 2017.[6] Thereafter, he was an officer within LendUS, and was partly responsible for overseeing all of the American Eagle division's operations and personnel.[7]

Defendant John Schrenkel is a former LendUS employee.[8] He was a senior executive at American Eagle, and he joined LendUS as part of LendUS's merger with American Eagle's parent company in 2017.[9] Thereafter, he was an officer within LendUS and, along with Defendant Goede, was responsible for overseeing all of the American Eagle division's operations and personnel.[10]

---

[2] Docket Item [hereinafter, "D.I."] 1, ¶ 12.
[3] *Id.* ¶ 7.
[4] *Id.* ¶ 18.
[5] *Id.* ¶ 13.
[6] *Id.* ¶¶ 14–18.
[7] *Id.* ¶ 21.
[8] *Id.* ¶ 12.
[9] *Id.* ¶¶ 13–18.
[10] *Id.* ¶ 21.

Non-party David K. Stein is an attorney who is licensed to practice in Ohio, Florida, the United States District Court for the Northern and Southern Districts of Ohio and the Eastern District of Michigan, and the United States Court of Appeals for the Sixth Circuit.[11] Mr. Stein is admitted to practice *pro hac vice* in this case. Mr. Stein does not represent the Defendants solely for purposes of this action; per the Plaintiff, he was also involved in facilitating the events at issue in this litigation, the Defendants' departure from LendUS and their subsequent employment with Supreme Lending.[12] As part of this case, LendUS sought to depose Mr. Stein about his knowledge of LendUS employees leaving to work for Supreme Lending. Because Mr. Stein is an attorney in this matter, and his involvement as a witness would bear on his ability to continue in his role as counsel, I granted the Defendants' Motion for a Protective Order on November 15, 2018.[13] I reasoned that the Defendants' ability to choose their counsel outweighed LendUS's need to depose Mr. Stein, in light of the fact that the information Mr. Stein possessed could be obtained elsewhere.

Non-party Bricker & Eckler LLP is a law firm in Ohio, of which Mr. Stein is a Partner.[14]

---

[11] Certification of David K. Stein, Esq. in Support of Mot. for his Admission *Pro Hac Vice* ¶ 8.
[12] *See* D.I. 86; D.I. 114; D.I. 138.
[13] *See* Nov. 15, 2018 Oral Argument Tr.
[14] *See* D.I. 48.

*B. Relevant Facts*

    1. The Underlying Litigation

LendUS filed this action on March 30, 2018.[15]  Its Complaint brought three counts: breach of contract, breach of fiduciary duty, and tortious interference with contract.[16]  Because this is a fledgling suit and there is relatively little record evidence, and because the underlying litigation is only marginally relevant to the current sanctions motions, I will merely summarize the relevant facts and allegations of this action, as laid out in the Complaint.

LendUS alleges that while the Defendants were employed with LendUS, they were responsible for managing and overseeing approximately three hundred employees within LendUS's American Eagle division.[17]  In 2017, LendUS investigated financial irregularities within American Eagle and concluded that the irregularities were likely the result of intentional misconduct.[18]  LendUS ultimately confronted the Defendants about the irregularities in early 2018.[19]  LendUS submits that at around the time of the confrontation, the Defendants began meeting with another mortgage lender, Supreme Lending, "to explore the possibility of Supreme

---

[15] *See* D.I. 1.
[16] *Id.* ¶¶ 35–53.
[17] *Id.* ¶ 21.
[18] *Id.* ¶ 23.
[19] *Id.* ¶ 24.

Lending acquiring most if not all of the people and assets of the [American Eagle] division."[20]

The Complaint further alleges that the Defendants decided to join Supreme Lending, and thereafter, they set out on a campaign to recruit American Eagle division employees to move to Supreme Lending, in violation of certain contractual covenants.[21] LendUS caught wind of the Defendants' purported behavior.[22] It terminated Goede and Schrenkel for cause on March 30, 2018, the same day that it filed the Complaint.[23]

As the suit progressed, the parties engaged in prolific motion practice. A significant point of disagreement was whether, under the relevant contractual terms, Delaware or Florida had jurisdiction over the litigation. On October 30, 2018, a Federal District Court in Florida decided that the case should proceed in Delaware.[24] Significant to the issues here is that the proceedings in this matter are bifurcated; predicate issues, relating to Count II of Plaintiff's Complaint, have proceeded on an expedited track, and that phase of the litigation is scheduled for trial on January 28, 2019 through February 1, 2019.[25] The extent to which discovery was also to proceed

---

[20] *Id.* ¶ 27.
[21] *Id.* ¶ 28.
[22] *Id.* ¶ 32.
[23] *Id.* ¶ 34.
[24] *See* D.I. 130, Ex. A.
[25] *See* May 31, 2018 Oral Argument Tr.

on a bifurcated basis is relevant to some of the issues involved in the sanctions motions, described below.

### 2. LendUS's First Motion for Sanctions

LendUS first filed a Motion for Sanctions on October 15, 2018. That Motion alleges that David K. Stein, while representing the Defendants in this matter, engaged in improper conduct in regard to David Berry, a LendUS employee. Specifically, LendUS claims that Mr. Stein, on behalf of the Defendants, filed a separate indemnification action against Mr. Berry in Ohio.[26] LendUS claims that this Ohio action was "entirely baseless" and was "used only as a vehicle to obtain *ex parte* discovery related to this litigation."[27] Per the recitations in LendUS's Motion, the Defendants sought to depose Mr. Berry, and told him that if he appeared for the deposition, the case against him would be dismissed.[28] Mr. Berry was deposed, without an attorney, by the Defendants' counsel, Mr. Stein.[29] The Defendants did not notify LendUS that Mr. Berry was to be deposed.[30] Afterward, the Ohio action was voluntarily dismissed without prejudice.[31]

In a second deposition—this time as part of the present litigation and with LendUS's counsel present—Mr. Berry stated that in his first deposition, the same

---

[26] D.I. 115, ¶ 14.
[27] *Id.* ¶ 16.
[28] *Id.*
[29] *Id.*
[30] *Id.*
[31] *Id.* ¶ 17.

attorney (Mr. Stein) had previously asked him some of the same questions; that is, in the first deposition, Mr. Stein had asked Mr. Berry questions relating to the LendUS litigation.[32] LendUS contends that this line of questioning sought disclosure of privileged information in violation of the Delaware Rules of Professional Conduct.[33] Among other things, LendUS requests the Court to sanction the Defendants and Mr. Stein, to prohibit the use of Mr. Berry's deposition, to prohibit Mr. Stein from contacting any current or former LendUS employees, to take steps to identify all improper conduct by Defense counsel, and to award LendUS reasonable fees and expenses associated with its Motion.[34]

In their Opposition to the Motion, the Defendants assert that the allegations in the Ohio litigation were meritorious.[35] They also assert that neither Mr. Stein nor the Defendants violated the Delaware Rules of Professional Conduct because Mr. Berry did not have the right to speak for LendUS; thus, his deposition was not an improper *ex parte* deposition.[36]

### 3. The Defendants' First Motion to Compel and for Sanctions

Shortly after LendUS filed its first Motion for Sanctions, the Defendants filed a Motion to Compel and for Sanctions on October 19, 2018. It, too, related to the

---

[32] *Id.* ¶¶ 19–22.
[33] *Id.* ¶¶ 23–33.
[34] *Id.* ¶ 36.
[35] *See generally* D.I. 125.
[36] *See generally id.*

8

Berry Depositions. The Defendants' Motion alleges that "anytime [sic] Defendants' counsel sought to explore Berry's knowledge of the facts underlying the allegations in the Complaint, Plaintiff's counsel inappropriately shut down questioning."[37] The Defendants argue that the Plaintiff's counsel attempted to improperly use attorney-client privilege to prevent discovery of relevant facts.[38] The Defendants seek an order compelling LendUS to produce Mr. Berry for deposition, requiring Mr. Berry to testify on the topics that he had previously been instructed not to discuss, and awarding the Defendants their fees associated with the motion.[39]

### 4. LendUS's Second Motion for Sanctions

LendUS filed a second Motion for Sanctions on November 8, 2018. In that Motion, LendUS alleges that on September 7, 2018, Mr. Stein filed suit in Florida against another LendUS employee, Rachel Brillhart May, seeking over $150,000 in damages for her purported failure to repay a loan.[40] According to LendUS, an intermediary told Ms. May that if she immediately quit her position with LendUS, the suit would be dismissed.[41] LendUS also alleges that Mr. Stein has continued to improperly contact current and former LendUS employees about the present litigation, without disclosing that contact to LendUS.[42]

---

[37] D.I. 120, ¶ 14.
[38] *Id.* ¶¶ 17–24.
[39] *See generally id.*
[40] D.I. 135, Ex. A; D.I. 135, ¶ 2.
[41] D.I. 135, ¶ 2.
[42] *Id.* ¶ 4.

In its second Motion for Sanctions, LendUS requests that Mr. Stein be disqualified from further involvement in this litigation.[43]

In its Opposition, the Defendants assert that this Court has no authority to make determinations regarding the May lawsuit, because it is not relevant to, nor does it interfere with, the present litigation.[44]  They also argue that LendUS's statements regarding Mr. Stein's communications with LendUS employees are false and misleading, and that sanctions are inappropriate.[45]

5. The Perel Deposition

On November 14, 2018, LendUS's counsel sent a letter to "inform the Court of recent unacceptable conduct by Defendants' *pro hac vice* counsel, David K. Stein," concerning a deposition taken the previous day.[46]  On November 13, 2018, the Defendants had deposed Michael Perel, a LendUS employee, regarding events relevant to this lawsuit.  LendUS's letter highlighted several instances of Mr. Stein's unprofessional conduct that occurred during the Perel Deposition.[47]  LendUS transmitted to the Court a copy of the deposition transcript, as well as a video recording.

---

[43] *Id.* ¶ 21.
[44] *See generally* D.I. 165.
[45] *See id.*
[46] D.I. 146, at 1.
[47] *See generally id.*

It is worth pointing out what apparently led to Mr. Stein's frustration at the deposition. As described above, this matter has been bifurcated, with issues arising from a single count of the Complaint proceeding on an expedited schedule. Accordingly, Mr. Caponi, representing the Plaintiff, instructed the witness not to testify regarding issues outside the scope of the portion of the action that had been expedited. Mr. Stein believed all matters relevant to the litigation, writ large, were fair game. This was a good faith dispute, which should have been resolved by counsel or, failing that, through referral to the Court. Unfortunately, Mr. Stein took another approach.

Upon simultaneously reviewing the deposition transcript and the video, it is clear to me that Mr. Stein took a hostile tone toward the Plaintiff's attorney, Steven L. Caponi, regarding Mr. Caponi's objections.[48] Mr. Stein repeatedly interrupted Mr. Caponi, and after one such interruption, he said to Mr. Caponi, "I really have seen enough and heard enough from you."[49] Mr. Stein questioned whether Mr. Caponi is, in fact, admitted to practice in Delaware[50] and whether he understands Delaware law.[51] Mr. Stein also referred to Mr. Caponi as "Egregious Steve"[52] and

---

[48] *See* D.I. 146, Ex. A, Perel, Dep., at 46:14–16 ("Okay. So is that an objection? Because I don't recall even hearing the word objection"), 49:10–24 (regarding speaking objections, "I don't know how they do it here in Delaware, but that's certainly not how it's done in the 49 other states"), 50:11–13 ("Is there an order to that effect? Can you pull out the order and show me?").

[49] *Id.* at 50:16–17.

[50] *Id.* at 174:1–2.

[51] *Id.* at 62:6–15.

[52] *Id.* at 51:12.

11

the "sovereign of Delaware"[53] throughout the deposition. Furthermore, Mr. Stein remarked, "Mr. Caponi, you don't get to create the rules. This is my deposition. I'm paying the court reporter. You don't create the rules."[54]

Mr. Stein badgered and belittled Mr. Caponi in a manner that was neither relevant nor productive to the present lawsuit. For instance, after a break, Mr. Stein inquired, on the record, whether Mr. Caponi had washed his hands after using the restroom.[55] He also said to the deponent, Mr. Perel, that he was "talking [with] little words so that [Mr. Caponi] can understand."[56]

This written recitation does not adequately convey the sarcasm and hostility that Mr. Stein expressed toward opposing counsel and the deponent. Beyond inappropriate words, Mr. Stein's unprofessionalism manifested through physical acts. The record reflects that Mr. Stein raised his hand and made yapping gestures toward Mr. Caponi while Mr. Caponi was speaking.[57] Mr. Caponi also relates that Mr. Stein "leaned across the table and [bared] his teeth" in an aggressive and exaggerated grimace while Mr. Caponi was speaking.[58]

---

[53] *Id.* at 171:22, 175:22–24.
[54] *Id.* at 254:18–21.
[55] *Id.* at 67:5–16.
[56] *Id.* at175:13–15.
[57] *Id.* at 54:16–22.
[58] D.I. 146, at 3.

12

Mr. Stein similarly harassed the deponent, Mr. Perel. Like his treatment of Mr. Caponi, Mr. Stein often interrupted Mr. Perel during the deposition.[59] Mr. Stein tenaciously inquired about Mr. Perel's personal life, extending beyond what was relevant to the lawsuit. This included inquiring about the reasons that Mr. Perel's marriage ended in divorce,[60] as well as prolonged questioning on Mr. Perel's use of alcohol and drugs, despite Mr. Perel's repeated answers that he does not drink. For instance, Mr. Stein questioned:

> Stein: The question is do you know whether there was litigation prior to [the Defendants'] termination?
>
> Perel: I don't know.
>
> Stein: You don't know?
>
> Perel: Or recall.
>
> Stein: Are you under the influence of any drugs or alcohol sitting here today?
>
> Perel: No. Why?
>
> Stein: Well, I'm asking the questions. So your answer is no. Is there anything that would harm or hinder your memory being able to answer truthfully here today?
>
> Perel: I only speak the truth, so no.
>
> Stein: Do you have a physical condition that prevents you from having the power of recall as to events that might have happened in 2018?
>
> Perel: I have no issue with my memory if that's what you're asking me.
>
> Stein: And you're not under the influence of any alcohol sitting here today?
>
> Perel: No, I don't drink alcohol. I have [a medical issue].
>
> Stein: When did you stop drinking alcohol?

---

[59] *See, e.g., id.* at 288:16–17, 289:8–19.

[60] D.I. 146, Ex. A, Perel Dep., at 74:22–23, 75:20–22.

Perel: I have never—I don't drink alcohol.

Stein: Never?

Perel: Yes. I have [a medical issue] . . . and I avoid alcohol at all costs.

Stein: Okay. Was that always the case while you were employed by RPM or LendUS?

Perel: Yes, that's always the case.

Stein: And you're not under the influence of any medication that would prevent your memory from working here today, are you?

Perel: No. . . . [61]

Furthermore, on multiple occasions, Mr. Stein questioned Mr. Perel's truthfulness. In addition to the aforementioned questions about whether Mr. Perel was under the influence of any drugs or alcohol during the deposition, and his sarcastic inquiry into Mr. Perel's mental and physical capacity, Mr. Stein accused Mr. Perel of "making things up"[62] and lying under oath. In the last several minutes of the deposition, Mr. Stein's questioning went as follows:

Stein: Daily conversations about the company folding up, where were those conversations taking place?

Perel: Daily conversations . . . with other American Eagle employees.

Mr. Stein: Who are those other employees? Let's get that very clear right now because you certainly seem to suggest something different than five minutes ago.

Perel: I'm not.

Caponi: Is there a question?

Stein: Yes. Who are the other employees that you had these conversations with?

---

[61] *Id.* at 69:3–70:15. Again, I note that words alone cannot adequately transmit Mr. Stein's sarcastic tone.

[62] *Id.* at 289:6–7.

Caponi: Before the witness answers, Mr. Stein, I ask you to lower the tone of your voice. I don't know if you[] notice it, but you're yelling and it's intimidating to the witness.

Stein: I'm not trying to intimidate any witness. I get upset when people are dishonest, especially when they're under oath and giving testimony in a case.

Perel: No one is being dishonest.

Caponi: Excuse me, Mr. Perel. Don't answer that question. Don't speak. Again, Mr…. Again, Sean [Brennecke] –

Stein: It's Stein, S-T-E-I-N.

Caponi: Sean, I just had your co-counsel insult a witness by calling him dishonest under oath when he's been answering these questions. That is completely inappropriate and he's been yelling at this witness for the last few minutes. And I've tried not to inflame Mr. Stein anymore [sic] by objecting. But I'm not going to tolerate it any further. He's either going to curb himself or again I'm going to take this witness and go. So I don't know if you need a break, Mr. Stein, to calm down, but we're not going to be subjected, this witness is not going [to be] subjected – I get paid to take abuse from people like you. This witness does not and I'm not going to tolerate it.

Stein: Well, I don't get paid to hear testimony that's made up. I want to know who the daily conversations were about.

Caponi: We're done with this deposition.[63]

At one point in the deposition, according to LendUS's counsel, after a contentious back-and-forth regarding Mr. Caponi's objections, Mr. Stein called Mr. Caponi and Mr. Perel "idiots." This comment was made off the stenographic record;[64] however, it is audible on the videotaped deposition recording.[65] Later in

---

[63] *Id.* at 294:11–296:20.
[64] *See id.* at 215:20–21.
[65] Mr. Stein uttered "idiots" at approximately 4:15:18 pm. Perel Video Dep., Video C, at 1:23:34.

15

his deposition, Mr. Perel testified that earlier, he had heard Mr. Stein call himself and Mr. Caponi "idiots."[66]

For much of the deposition, the Defendants' Delaware counsel was not present. Mr. Caponi first asked Mr. Stein to adjust his behavior, and when Mr. Stein did not, Mr. Caponi asked the Defendants' Delaware counsel to attend the rest of the deposition as a check on Mr. Stein. Mr. Stein's unprofessional antics continued, and, as evidenced in the earlier excerpt, Mr. Caponi ultimately ended the deposition. He notified the Court by letter the next morning.[67]

In response to Mr. Caponi's November 14, 2018 letter setting out the facts recited above, the Defendants' Delaware counsel submitted a letter on November 15, 2018. Counsel stated that they were still reviewing the Perel Deposition transcript.[68] Counsel for Mr. Stein and his law firm, however, submitted a letter on November 15, 2018 that asserted, on behalf of Mr. Stein, that at the Perel Deposition, Mr. Stein had "comported himself in a manner expected of lawyers practicing in this Court," and that Mr. Caponi's "repeated[] fail[ure] to comply with established deposition rules provoke[ed] unnecessary consternation . . . ."[69] Importantly, that letter claims that "[n]owhere in the Deposition record can Mr. Stein be seen or heard

---

[66] D.I. 146, Ex. A, Perel Dep., at 287:1–17.
[67] *See generally* D.I. 146.
[68] D.I. 151, at 2.
[69] D.I. 157, at 1–2.

to have uttered the word 'idiot' in the direction of Plaintiff's counsel or the deponent,"[70] despite the representation to the contrary in the Plaintiff's November 14 letter.[71] It also claims that "the only record support for this contention was 'developed' by Plaintiff's counsel . . . ."[72]

### 6. The Defendants' Second Motion to Compel and for Sanctions

After the Perel Deposition, on November 21, 2018, the Defendants filed a second Motion to Compel and for Sanctions. Similar to their first Motion to Compel and for Sanctions, which sought to compel LendUS to produce Mr. Berry for further deposition, the second Motion requests that LendUS produce Mr. Perel for further deposition.[73] The Defendants submit that this is necessary because, contrary to Chancery Rule 26(b)(1), which contemplates broad discovery, Mr. Caponi improperly instructed Mr. Perel not to answer questions during his first deposition.[74] The Defendants also seek attorneys' fees in connection with the Motion.[75]

### 7. Pending *Pro Hac Vice* Motions

As oral argument on the sanctions motions approached, the Defendants moved to withdraw Mr. Stein's *pro hac vice* admission, "to avoid further distraction from

---

[70] *Id.* at 5.
[71] At Oral Argument on December 4, 2018, Mr. Stein's counsel orally withdrew this representation.
[72] D.I. 157, at 5.
[73] *See generally* D.I. 166.
[74] *Id.* ¶ 18.
[75] *See id.*

17

the merits of the case."[76]  They also moved to admit Anne Marie Sferra, another

Partner at Bricker & Eckler, *pro hac vice*.  LendUS promptly opposed both motions.

It opposed Mr. Stein's withdrawal until after oral argument on the sanctions motions,

since the motions implicate Mr. Stein's *pro hac vice* status.[77]  It opposed Ms. Sferra's

admission as premature, given that the pending motions for sanctions against Mr.

Stein also run to Bricker & Eckler, and expressed concern that Ms. Sferra's

admission would be an opportunity for Mr. Stein to exercise "dead hand control"

over the case.[78]

## C. Procedural Posture

LendUS initiated this action on March 30, 2018, along with a Motion for

Expedited Proceedings.  The Defendants filed a Motion to Dismiss on August 8,

2018; thereafter, the parties engaged in prolific motion practice, some of which is

discussed above.[79]  The Motion to Dismiss was mooted in part by an October 30,

2018 decision from the United States District Court for the Middle District of Florida

that found that Delaware has jurisdiction,[80] and I denied what remained of the

Motion to Dismiss in a November 15, 2018 bench decision.  Also on November 15,

---

[76] D.I. 183, at 1.

[77] D.I. 185, at 1.

[78] *See* D.I. 186.

[79] For the purposes of this opinion, I need not engage in a tedious recitation of these motions, many of which relate to discovery.  I instead discuss the case history only to the extent that it is relevant to the present dispute.

[80] *See* D.I. 130, Ex. A.

I granted the Defendants' Motion for a Protective Order to prevent the deposition of Mr. Stein, as discussed above.

The outstanding motions currently pending are: (1) LendUS's October 15, 2018 Motion for Sanctions; (2) LendUS's November 8, 2018 Motion for Further Sanctions; (3) the Defendants' October 19, 2018 Motion to Compel and for Sanctions; (4) the Defendants' November 21, 2018 Motion to Compel and for Sanctions; (5) the Defendants' November 30, 2018 Motion to Withdraw the Admission *Pro Hac Vice* of David K. Stein, Esquire; and (6) the Defendants' November 30, 2018 Motion for Admission *Pro Hac Vice* of Anne Marie Sferra, Esquire. The first phase of trial is scheduled for January 28, 2019 through February 1, 2019. I heard oral argument on the outstanding sanctions and *pro hac vice* motions on December 4, 2018.[81] This Memorandum Opinion addresses those motions.

## II. ANALYSIS

### A. Motions for Sanctions Against the Defendants and their Counsel

The Delaware Bench and Bar guards jealously its reputation for civility, collegiality, and candor. This is not simply a matter of parochial pride, nor fusty pretentiousness or fulsome self-regard. It rests on a sincere belief that the end toward which we as judges and lawyers work—a truthful exposure of the facts in pursuit of

---

[81] On December 4, 2018, I also heard oral argument on LendUS's Motion to Compel, which I granted from the bench.

justice—is best served by our tradition of respect and civility accompanied by vigorous, not vinegarish, advocacy. The edifice that supports a civil and robust pursuit of truth is stable but not self-maintaining: as with a three-legged stool, withdrawal of support by any of the litigants or by the Court can cause it to topple. Accordingly, here, counsel "should not reflect any ill feelings that clients may have toward their adversaries in their dealings with the Court and other counsel."[82] Likewise, despite any personal feelings of an attorney himself toward opposing clients or counsel, we expect professional behavior in pursuit of professional duties. Delaware case law makes clear that our courts will not condone, "accept or permit the use of profanity, acrimony, derisive gibes, or sarcasm with respect to any communication related to any matter, proceeding, writing, meeting, etc. . . . ."[83]

When practicing in Delaware and in this Court, an attorney has obligations to the Court under both the Delaware Lawyers' Rules of Professional Conduct and the Principles of Professionalism for Delaware Lawyers.[84] The Delaware Rules of Professional Conduct provide that a lawyer shall not knowingly "make a false statement of fact or law to a tribunal . . . ."[85] Those rules also prohibit a lawyer from engaging in *ex parte* communication.[86] More broadly, the Principles of

---

[82] *395 Assoc., LLC v. New Castle Cty.*, 2005 WL 3194566, at *4 (Del. Super. Ct. Nov. 28, 2005) (quotation omitted).
[83] *Crowhorn v. Nationwide Mut. Ins. Co.*, 2012 WL 1274052, at *5 (Del. Super. Ct. May 6, 2002).
[84] Ct. Ch. R. 170(c)(ii).
[85] Del. R. Prof. Conduct 3.3(a).
[86] Del. R. Prof. Conduct 4.3.

Professionalism for Delaware Lawyers state that "[a] lawyer should develop and maintain the qualities of integrity, compassion, learning, *civility*, diligence, and public service."[87] They define professional civility as "conduct that shows respect . . . for all people encountered in practice," which includes "emotional self-control [and] the absence of scorn and superiority in words or demeanor."[88]

These obligations bind Delaware lawyers, and they apply with equal force to lawyers who are permitted to practice in this state under a *pro hac vice* admission.[89] That admission, fundamentally, is a privilege, as is its analog to Delaware lawyers admitted to practice for specific litigation in sister jurisdictions. When an attorney who is admitted *pro hac vice* engages in conduct that is repugnant to this Court's ideals of civility and candor, revocation of that attorney's *pro hac vice* admission is an appropriate sanction.[90]

Proceedings resulting in sanctions are, and should be, rare in this Court. When they do arise, it is most common for an opposing party to move for sanctions; however, it is worth noting that the Court may raise the issue of sanctions *sua*

---

[87] Principles of Professionalism for Delaware Lawyers, Principle A (emphasis added).
[88] *Id.*, Principle A(4).
[89] *See* Ct. Ch. R. 170(c)(ii).
[90] *See State of Del. v. Mumford*, 731 A.2d 831, 835–36 (Del. Super. Ct. 1999) (revoking *pro hac vice* admission due to an attorney's failure to control his client's behavior); *State of Del. v. Grossberg*, 705 A.2d 608, 613 (Del. Super. Ct. 1997) (revoking *pro hac vice* admission because an attorney made inaccurate representations to the court and violated other Rules of Professional Conduct).

*sponte*.[91] The Court may also revoke a *pro hac vice* admission *sua sponte* if it determines that continued admission is "inappropriate or inadvisable."[92] Nevertheless, because of the potential for abuse, a party seeking sanctions in the form of disqualification faces a heavy burden: the party must show, by clear and convincing evidence, that the behavior of the attorney in question "is so extreme that it calls into question the fairness or efficiency of the administration of justice."[93] The right of a litigant to choose her counsel is fundamental, and must not be abrogated absent compelling reason. In other words, I must exercise my discretion in considering LendUS's request to revoke Mr. Stein's admission with great care.

Here, the deposition transcript and video recording, discussed at length above, speak for themselves. Mr. Stein may have labeled his opposing counsel "Egregious Steve," but it was Mr. Stein's actions that were, in fact, egregious. Mr. Stein harassed opposing counsel and the deponent, using sarcasm and accusations of perjury, and rude gestures and grimaces, in an unprofessional manner. It is clear to me that Mr. Stein intended his behavior to intimidate and discomfort the deponent. In other words, his behavior appears not only to be rude, but tactically so.

---

[91] *See, e.g.*, *In the Matter of Ramunno*, 625 A.2d 248, 249 (Del. 1993) (court raised sanctions *sua sponte*); *395 Assoc., LLC v. New Castle Cty.*, 2005 WL 3194566, at *1 (Del. Super. Ct. Nov. 28, 2005) (same).

[92] Ct. Ch. R. 170(e).

[93] *Manning v. Vellardita*, 2012 WL 1072233, at *2 (Del. Ch. Mar. 28, 2012) (quoting *Dunlap v. State Farm Fire & Cas. Co. Disqualification of Counsel*, 2008 WL 2415043, at *1 (Del. May 6, 2008)); *see also Crowhorn v. Nationwide Mut. Ins. Co.*, 2012 WL 1274052, at *4 (Del. Super. Ct. May 6, 2002).

22

I note that, from time to time, otherwise professional and diligent advocates may suffer a momentary loss of composure, which is regrettable, but understandable during a contentious legal proceeding. These temporary lapses are unfortunate, but do not warrant motion practice—particularly where, as is the norm in Delaware, the attorney later apologizes to the other parties involved. Mr. Stein's behavior in this case, in contrast, occurred *repeatedly* over an hours-long deposition. Rather than a momentary lapse of judgment, it indicates a systematic intent to intimidate the witness and to hector opposing counsel.

Equally disturbing was Mr. Stein's initial lack of candor to the Court. The Movant alleged that Mr. Stein, during the deposition, called opposing counsel and the deponent "idiots," which is clearly inappropriate conduct. This reference does not appear in the deposition transcript, presumably because it was delivered *sotto voce*, in a stage whisper that escaped the court reporter as the reporter was reading back a question. In response to this accusation, Mr. Stein's counsel wrote a letter to the Court on November 15, in which Mr. Stein not only denied that he had called the witness and his counsel idiots, but suggested that opposing counsel had "developed"[94] the record, presumably to reflect unprofessional behavior on behalf of Mr. Stein, and stated that "the video recording . . . *will discredit this contention*

---

[94] *See* D.I. 157, at 5.

23

*as another out-of-context, embellishment* [sic]."[95]   Obviously, whether Mr. Stein

called counsel and the witness "idiots" is a matter known to Mr. Stein.  Just as

obviously, the implication that LendUS's counsel had invented Mr. Stein's use of

the term "idiots" in order to obtain a favorable result from this Court is a serious

accusation of misconduct.  However, the videotape was to the contrary;  Mr. Stein's

utterance of the word "idiots" is clearly audible to me, and I find that it was meant

to be heard by the participants.[96]  I find this lack of candor particularly egregious,

because it is an untruth used as both shield and sword: to insulate Mr. Stein from the

fruits of his unprofessional conduct, but also—worse—to traduce opposing counsel.

This, from an officer of the court, cannot stand.  I find Mr. Stein's continued

admission *pro hac vice* to be both inappropriate and inadvisable.

I say this notwithstanding the fact that Mr. Stein, at argument on these motions

and at the request of his counsel, forthrightly appeared and apologized for his

behavior in the Perel Deposition.[97]  He did not attempt to deny or diminish the

conduct about which the Movant complained.  He explained that he had allowed his

frustration to get the better of him, and acted in a way that, he avers, was not only

inappropriate, but utterly uncharacteristic of his career as a lawyer.  I accept this

---

[95] *Id.* at 4 (emphasis added).

[96] Mr. Stein called Mr. Caponi and the deponent "idiots" at approximately 4:15:18 p.m.  Perel Video Dep., Video C, at 1:23:34.

[97] *See* Dec. 4, 2018 Oral Argument Tr.

assertion, and it is unfortunate that he allowed himself to act in an unprofessional manner that was not representative of what he acknowledges is his responsibility as an attorney. A single incident cannot capture the tenor of an entire career. However, my interests in justice, both specific and systematic, convince me that Mr. Stein's admission *pro hac vice* must end.

I turn, then, to the appropriate sanction. Because of Mr. Stein's conduct, as laid out above, I find it appropriate to award LendUS its reasonable attorneys' fees incurred in prosecuting its Motion for Sanctions in connection with the Perel Deposition, as well as its fees incurred in attending the deposition, to be paid by Mr. Stein and his firm, and not by their clients. The remaining question is whether to grant Mr. Stein's Motion to Withdraw, or to revoke his admission, pursuant to Rule 170(e). Counsel for LendUS asks that I revoke, suggesting that *pro hac vice* reporting requirements are such that revocation will serve a punitive function on Mr. Stein going forward. I address the question cognizant of the fact that, in any event, the pursuit of justice *in this matter* will not be impeded by granting Mr. Stein's Motion, in light of his absence from this case.

I find it appropriate to grant Mr. Stein's Motion to Withdraw, and to refer the matter to the Delaware Office of Disciplinary Counsel. Disciplinary Counsel may then consider the Perel Deposition misconduct, the circumstances of the November 15 letter, and, to the extent it finds appropriate, the additional allegations of

misconduct addressed below, together with exculpatory factors (if any). So informed, it can determine whether further action is required.

In addition to the misconduct related to the Perel Deposition, LendUS makes other allegations as well. As laid out in the Background section of this Memorandum Opinion, LendUS's counsel represents to the Court that Mr. Stein has abused legal process in Ohio and Florida by bringing actions, *not* to obtain the relief sought in those complaints, but to seek an advantage on behalf of his clients in this suit, or for their business generally. I direct Mr. Stein to disclose to LendUS, within ten days of this decision, each *ex parte* contact he has made with LendUS's employees, either in the context of the Florida or Ohio litigations or otherwise during the pendency of this case. As for sanctions, however, I note that the facts regarding these other matters are not developed in the record before me. At oral argument, Delaware counsel for the Defendants indicated that they had undertaken an appropriate inquiry as to whether these foreign actions implied improper behavior regarding *this Delaware action*, and concluded in the negative. I find that no sanctions are warranted, in this jurisdiction and based on the record before me, for Mr. Stein's conduct in the Florida and Ohio actions. Nonetheless, the allegations of abuse of process are serious, if unproven. Accordingly, I refer these matters to the Ohio Supreme Court's Office of Disciplinary Counsel and the Florida Supreme Court's

Department of Lawyer Regulation. To be clear, the alleged misconduct relating to the Ohio and Florida actions does not form any basis for my decision here.

I note that I previously granted the Defendants' Motion for a Protective Order to prevent the deposition of Mr. Stein. Mr. Stein represented the Defendants at the time of the alleged wrongful competition and breach of fiduciary duty. LendUS insists that he facilitated the Defendants' malfeasance, and is accordingly an appropriate fact witness in this matter. As such, LendUS sought to depose him. I found, however, that Mr. Stein should not be deposed, in order to honor the Defendants' choice of counsel and because LendUS had not shown that the information Mr. Stein possessed could not be acquired elsewhere. Now, however, because Mr. Stein is no longer trial counsel in this litigation, LendUS may find it appropriate to revisit the issue of deposing Mr. Stein.

Pending is the Defendants' Motion for Admission *Pro Hac Vice* of Anne Marie Sferra, Esquire. Along with Mr. Stein, Ms. Sferra is a Partner at Bricker & Eckler LLP. LendUS objects to Ms. Sferra's admission, citing concern that it will be a sham admission that will allow Mr. Stein to control the litigation.[98] I, however, have another concern. If Mr. Stein becomes a fact witness in this matter, his firm's representation of the Defendants may be problematic. Rather than address this issue in a potentially advisory fashion, I defer decision on the Motion pending LendUS's

---

[98] D.I. 186.

decision whether it will again seek to depose Mr. Stein—a decision it should make promptly, at which point I will allow the parties to supplement their arguments. I note that my decision to defer action on the Motion for Admission *Pro Hac Vice* arises solely from the concern addressed above; it is not reflective of Ms. Sferra's qualifications or her fitness to practice in Delaware, nor those of her firm.

### B. Motions to Compel and for Sanctions Against LendUS and its Counsel

As discussed above, the Defendants have filed two Motions to Compel and for Sanctions. The Defendants' Motions seek, respectively, to compel deposition testimony of Mr. Berry and Mr. Perel, in response to Mr. Caponi's instructions to the witnesses not to answer and his decision to truncate deposition testimony. In light of the facts laid out above, sanctions are not appropriate. I commend to Delaware counsel the issue of whether further discovery is needed from Mr. Berry and Mr. Perel, which I expect they will be able to resolve in good faith.

### III. CONCLUSION

For the forgoing reasons, the Plaintiff's Motions for Sanctions are granted in part, and the Defendants' Motions for Sanctions are denied. The Defendants' Motion to Withdraw the Admission *Pro Hac Vice* of David K. Stein, Esquire is granted. I defer consideration of the Defendants' Motion for Admission *Pro Hac Vice* of Anne Marie Sferra, Esquire, as well as the Defendants' Motions to Compel. The Parties should submit an appropriate Order.

28